Hampton versus Kohler. Mr. McNeil. Good morning your honor. Is my audio working? Yes it is. May it please the court my name is Don McNeil and I represent Bruce Hampton the appellant in this matter. We respectfully request that the district court orders that was filed on July 25th 2019 be reversed in this matter be remanded from trial. We contend that the district court committed a reversible error because it failed to view the facts and the light most favorable to Mr. Hampton when it considered and resolved issues of material fact in reaching its decision. Rather than staying within the four corners of the party's agreement the district court reached beyond those four corners to consider its extrinsic evidence and not the facts and the light most favorable to Mr. Hampton. Summary judgment is inappropriate in this case for the purpose and meaning of the party's contract, whether Mr. Hampton his termination was involuntary, specifically who initiated the termination, and the circumstances surrounding the reasons for Mr. Hampton's termination. The district court improperly considered and weighed the evidence in the light most favorable to Mr. Kohler and not Mr. Hampton. The court is aware this matter turns on the post-closing agreement which is two sentences. I'd like to go through a couple of items and highlight what we have addressed in our briefing. The two sentences said first he should be must be still employed to be eligible to receive the escrow payment his pro rata share. The second sentence is the one that's operative here and that is that he is not required to be there still employed if his termination was without cause by the company. The district court first at page 14 goes outside of the record to talk about what the purpose of the escrow agreement was and it's and the court found without any evidence in the record that the purpose was for predictability and protections throughout the transition period. This is an escrow agreement and exhibit D to Mr. Harris saws affidavit shows how the escrow was to be paid out. This is the pro rata share Mr. Hampton's shares that he owned as a minority shareholder when his company was sold. There was four million dollars placed in escrow and he had a pro rata share of about a hundred sixty four thousand dollars. There's nothing the record said this is only for predictability and continuation during a transition period. Instead we know because November 2017 when the escrow payment was paid out there's only a nominal decrease in the escrow payment. He would have received about six thousand dollars less or three percent less. Second at page 15 the court spent two pages talking about constructive discharge which was not even an issue Mr. Hampton has raised in this matter. Third at page 16 of the district court's order this is I think is the key to the reason of why we think there was reversible error and this should be remanded for trial is because the court viewed the light most favorable to Mr. Kohler to find that Mr. Hampton has expressed a willingness to leave before obtaining renewals of customer agreements and that was with a major customer. Mr. Hampton in his affidavit and his deposition consistently said what had happened here is he was given new job responsibilities which included international travel. He went to his immediate supervisor and asked whether that was something that they could reconsider because he had a singer in high school and elderly parents that he wanted to be home for them. All he was asking for was reconsideration on job responsibilities and whether that would work for them and instead after having a meeting with the CEO after speaking to Mr. Spidell and Mr. Finnessey several days later the company offered him a severance package to depart. That 30 days later more than 30 days later became effective. When the court found that he had expressed a willingness to leave before obtaining renewals of agreements with a major customer that is not in the light most favorable to Mr. Hampton. Instead the light most favorable to Mr. Hampton is that he went to them and said do I need to do this international travel that is not something I have done in the past can I do something different will you work with me on this and instead they came back to him and said your value to us in essence is we just need you around to help us renew a contract with a major customer. Counselor, I have trouble perceiving the materiality of which of the exchange you're talking about because the separation agreement came after that. Yes your honor and thank you. Judge Loken the materiality is exactly what we we believe should have happened here is you don't need to go any further than the separation agreement. The separation agreement is plain and ambiguous language said that it was Kodolsky that wished to reach an amicable separation with Mr. Hampton and then it was Kodolsky who presented the separation agreement. Their attorneys drafted the separation agreement. They're the ones that presented it to Mr. Hampton. He did not initiate any of that and then the language contained in the separation agreement is also plain and ambiguous and it says the parties separation is without cause by either party. That's saying in plain and ambiguous language that Mr. Hampton did not initiate this. Let me stop you. Are you arguing and I think you are determination without cause and separation without cause have the same meaning. Yes I am your honor. And what what authority do you have for that? The dictionary would not support that. Your honor I think the dictionary does support me on that. The separation and determination would considered in the language that's contained in a separation agreement says that the company is initiating the termination. This is not initiated by Mr. Hampton. So the fact in the light most favorable to Mr. Hampton is that the company presented a separation agreement and it was their attorneys that drafted this. Your honor I go on to my fourth point in the district court's order on page 17 of the order where the court references that Kodolsky wanted to keep Mr. Hampton around until it said April 2017 but remember the escrow payment became due in November 2017. I don't know where the district court picked up that April date that's the wrong date. It's November 2017 but here's the point when we're reading the light and most favorable vote to Mr. Hampton. Is everybody happy here? That's what's going on here. The clause that required continued employment was to keep Kodolsky happy and they wanted to have this this employee. They liked him that's what their testimony was. It's just they didn't need him anymore and how do I know that's because if you look at the lights most favorable to Mr. Hampton we know first of all everybody testified no loss of revenue for Kodolsky. They didn't lose anything by losing Mr. Hampton. Second very much. Counsel let me ask you in that regard does the record reflect what the difference in monetary value would be between the the post the escrow payment being sought in this lawsuit and the benefits the extra benefits provided in the separation agreement? I think it does. I think exhibit B to Mr. Harris does affidavit has the accountants numbers that show how much he was entitled to receive and then we also know that in the end when it came time his the amount he should have received was about a hundred and fifty five thousand dollars. So it's um the difference is about three percent. So three percent so the the extra benefits I mean the thirty seven five hundred and the three months health health health benefits and the salary bonuses to April 30. All that adds up to three percent less than the hundred and fifty five thousand is that the minority? No no I must be misunderstanding your question. No I'm saying you can do the math. You can see that the three percent reduction in the escrow is nominal. You know it's certainly our position if we had a trial that that escrow was just for unrealized liabilities and debts that the company bought. I don't understand the escrow. No my question is entirely different. I'm looking at I'm viewing I'm trying to question whether this isn't a whether this isn't a mutually agreed settlement in which he gave up by not being terminated without cause gave up a hundred and fifty five thousand and he got that array of extra benefits described in the district court's it looks to me like they would equal or exceed exceed a hundred and fifty thousand. Your honor it would not exceed that hundred fifty thousand dollars if I understand. That's why I asked you to have they is there somewhere I can go to quantify? Other than a separation agreement I don't do not think you can quantify the value of that separation agreement. It gives you the thirty seven thousand five hundred severance payment and some benefits but it does not give you any additional how much he was paid to help out because he certainly consented. No that's that's argument. I was just looking for facts. Thank you. Yes okay. Your honor if I the video does not give me my time but I I'm calculating I only have a few more minutes but here's the couple other points. You have four minutes. Thank you judge. So you go back to whether there's no loss in revenue because that's what both Kodalski's executives testified. Second of all there's very little reduction in the ESCO. Three percent. So does that mean Mr. Kohler lost out it very much money? No he didn't even lose out any money. Third of all did Mr. Hampton's position get replaced which would be more akin to somebody who had quit his job? No they testified they didn't even replace him. That they just took his job responsibilities and gave it to others. Fourth, did they keep him on the payroll? No. Kodalski got the benefit of not even having him on the payroll. Fifth, did Kodalski were they happy because they got what they needed out of them in the consulting agreement? Yes they did. They were able to renew that major customer. And then finally the agreement the post-closing agreement between Kohler and Hampton did Kohler lose out anything? No he didn't lose out anything. This would be a total windfall for him because he didn't lose out anything. Finally your honor pick up on what Judge Loken has just pointed out is it's our position that the district court should have stayed within the four corners of that separation agreement and that language said that it was Kodalski that initiated the termination and not Mr. Hampton and that would entitle Mr. Hampton to receive his share of the pro-rata escrow that was available to him. Your honor based upon those reasons we respectfully request that this matter be reversed and remanded for trial. Thank you Mr. McNeil. You'll have about two and a half minutes left for rebuttal. Mr. Harrisfall. Thank you your honor. May it please the court, counsel. This appeal essentially requires that the number one was Mr. Hampton terminated by Kodalski, number two was the termination without cause as described in the employment agreement, and number three does the resolution of either of those issues require the determination of material disputed issues of fact. The answer to all three of those questions is no. The post-closing agreement unambiguously states that in order for the exception to continuous employment to apply, he must be terminated by the corporation without cause as provided in the older milestone employment agreement. That language in the post-closing agreement references and incorporates the express without cause provision of the employment agreement and there was no attempt to comply with that provision requirement of 30 days written notice prior to termination. Section 16B of the employment agreement. Moreover, since the termination was in fact initiated by Hampton, and I'll talk more about that in a moment, but because it was initiated by Hampton it could not counsel counsel this is Judge Smith. How do we know it was initiated by Hampton? What record fact tells us that? Let me find the sites to the First of all, in the initial discussion where this came up, and my colleague was discussing this in his presentation, where Mr. Hampton was complaining about the travel that was required, his own testimony is, and this is Hampton deposition pages page 36 beginning at line 9 through 22, he told Mark Greer, his immediate supervisor, the president of the local organization, that he wanted Koudelski to treat him like Mark Thompson. Mr. Thompson, it is undisputed in the record, was fired without cause by Koudelski. In other words, he hadn't done anything wrong, he was fired without cause, so Mr. Hampton was asking to be fired because that's what they did with Thompson. This was the first time there was a discussion of his future after they discussed the change in his responsibilities, and he starts talking about a separation. Additionally, he admits he was... Is that what the company did? Did the company treat him that way? Well, no, not entirely, because... If the company fired him for cause, then wouldn't that be to Mr. Hampton's advantage? With Mr. Thompson, the company initiated the termination, your honor. The company, and we have a record that supports this, that he did not want to leave, and he had no intention of leaving, but the company gave him no choice and terminated him without cause. That testimony is unopposed in this record. So it was clearly a different situation because Mr. Thompson did not want to leave the organization, and Koudelski wanted him to leave. On the other hand, for Mr. Thompson, they wanted him to stay. In the testimony of those executives from Koudelski, they wanted him to remain, quote, in perpetuity, end of quote. Counsel, does the record show what Mr. Hampton's view of his statement meant in terms of when he said, I want what the other person got, what his intentions were in that statement? I don't believe it does, your honor. I think we only have in the record his actual words. So what you're presenting is a construction of what he said as opposed to an undisputed meaning. Well, he said he wanted to be treated like Thompson, and to the only thing that, the only context that's relevant. You want us to read that the way you read it as opposed to the way perhaps he would. He has not proffered a contrary interpretation, your honor. There is nothing in the record that would suggest any kind of the statements by. Counsel, Judge Loken, I don't understand why it matters that the termination was initiated by Hampton. What matters is the termination was not without cause. It was a mutually agreed separation. That's exactly right, your honor. Therefore, it doesn't fit 16B or the PCA. You're precisely correct, your honor. Why are we deviating from that reading of, that's just staying within the contracts. I agree it is, but Judge Frank went at it in a slightly different direction, your honor. He was focusing on who initiated the termination for purposes of the by the company language, and I think he was taking a lead here from the other district court opinions that we had cited, Kavinsky and Willinson, where the court adopted a similar mode of analysis using similar contract language. Number one, conclude that this was not ambiguous language, but you're absolutely correct. There are two provisions here under the employment agreement, the old milestone employment agreement. There's 16A that addresses mutual consent of Koudelski and Hampton, and then there is 16B that allows for a without cause termination by Koudelski, but would have required 30 days written notice, something that never occurred. And since under the rules of contract construction, the more specific clause should govern over the more general, 16A mutual consent is clearly more requirement. The only evidence that Mr. Hampton offers, and I agree with you, Judge Loken, that that is as far as you need to go, but to the extent... It doesn't even matter whether this was 16A. It just wasn't 16B, and if it wasn't 16B, then the PCA provision isn't triggered. Am I wrong about that? No, Your Honor, you're absolutely right. But again, just to help the court understand the way Judge Frank was looking at it, because of the fact that Mr. Hampton contests who initiated it, the only evidence in this record that would suggest that Mr. Hampton did not initiate it is his self-serving declaration of inadmissible hearsay that Koudelski told him they wanted to terminate his employment. You cannot accept that testimony for the truth of what it says, because it is classic textbook hearsay. Now, there is some suggestion in... Why wouldn't that be an admission against interest? Because Koudelski is not a party, Your Honor. It was not a statement attributed to Mr. Kohler, but to the successor entity. Mr. Hampton argues in his brief that you can consider inadmissible hearsay about what he claims the Koudelski executive said to him, even though they all deny it. Uniformly, they all deny it. But this is... And he's relying on the financial timing publications case, but that is an inaccurate reading of that decision. Financial timing publications does not allow the court to consider, or excuse me, to rely on inadmissible hearsay. In that case, there was other admissible evidence upon which the court relied to determine that there was a fact issue requiring a trial. And there's also a reference to an expression in the What that foretold was that the evidence does not have to be in a form that is admissible in trial. All that means is that a party can submit by affidavit what they will then be able to put into trial at evidence by way of either deposition or live testimony. It does not mean that we ignore the rules of hearsay. And this statement by the plaintiff, by Mr. Hampton himself, will not be admissible at trial, because he again has nobody else who can support it. The guys from Kedelski, the executives, absolutely refuted it. They said no such thing to him. So the only way that comes into evidence is if it's by Hampton, and that is classic hearsay. It will not come in. The Smith versus Kilgore case, which I don't believe we cited in our brief, discusses this issue that's found at 926 F3, 479. And a similar result with Judge Loken on the panel back in 2018 was the Jesinoski versus Countrywide Home Loans decision where summary judgment was upheld despite a self-serving affidavit that contained inadmissible hearsay. And that case is found at 883 F3, 1010, specifically page 1014. I'd like to turn to one other point on that. I believe my colleague will assert that they are trying to get this hearsay evidence in the record because it's not being offered for the truth of the matter, that they actually told him this, but instead for its impact on Mr. Hampton himself. But that doesn't matter. It becomes a material issue if you are looking at it for its impact on him. All he had to do was to sit tight until the escrowed amount would vest, and he would either be terminated without cause, as was allowed under 16b, guaranteeing him the right to participate, or they would have kept him employed. So what he was thinking at the time doesn't matter. Well, does it matter that the company has come to him and told him that if he's unwilling to do as they would desire to do with him, send him overseas, that they would terminate him? No, your honor, it doesn't. Number one, again, that's absolutely denied by everybody at Kedelsky, and so it would be, again, inadmissible hearsay. But even if it were true, then what he should do is take the presentation to him of a separation agreement was, in fact, a statement of their intent to obtain his termination. Because, your honor, it wouldn't matter. Even if that was their intent, all he had to do was wait for them to pull off the termination, rather than jumping into a mutually agreed-upon termination, which precludes him under the post-closing agreement from any recovery. He had to be terminated without cause, and he had to wait for it to actually happen if he was going to be entitled to participate in the escrowed amounts. Otherwise, all of those issues become immaterial. And whose responsibility is it to interpret the meaning of without cause, in terms of when the parties, when that separation agreement uses that phrase that it's without cause from either party? The court needs to look back to the actual employment agreement that Mr. Hampton had with Milestone. There it defines, there it explains the various types of cause that can exist. And that employment agreement is expressly incorporated by reference in the post-closing agreement, where it refers to a termination without cause. So it is based on those contracts, and the incorporation of those two contracts, that we arrive at what a without cause termination is. And some unwillingness to go abroad would not have constituted cause. I'm sorry, Judge. The question was, who decides? The answer is the court, right? That is the answer. The court, looking at the contract language, absolutely. Mr. Hampton argues that Judge Frank improperly looked to extrinsic evidence to determine the purpose of the agreement. And my colleague suggested to you a moment ago, that a purpose of the post-closing agreement was to make Kedelsky happy. That's absolutely untrue, and there is nothing in the record to support it. You don't have to look beyond the four corners of the post- closing agreement to determine what its purpose was. It states in sections 1 and sections 3, that its purpose was to require that Hampton stay there through the escrow dates, or suffer a termination without cause under the language of the employment agreement. It states this in two places, that he has to the judge at the district court level, Judge Frank, would not have to look outside that contract to arrive at that conclusion. But there is absolutely nothing that suggests that the purpose of the post-closing agreement, to which Kedelsky was not even a party, was to make them happy. But we do have the declaration of Mr. Kohler in the record, where he explained, and he was a party to the post-closing agreement, where he explained why this was important to him. And it was to make sure that Mr. Hampton was still there, rowing the boat towards the achievement of these burnout objectives, in order to improve the amount that everybody would recover. One other point that I just want to touch upon, involving the Capistrant decision, and this issue of materiality, because it's been briefed extensively, I would just emphasize that the Capistrant court, the Minnesota Supreme Court, did not remand the case because it found the contract issue to be immaterial, but because it appeared the district court and the Court of Appeals in Minnesota had failed to consider materiality. Judge Frank absolutely considered the materiality of this requirement, that Mr. Thank you, Your Honor. If I could go back and address... If I can interrupt, right, I'm sorry to do it right away, but there's one fact that I find crucial that I'd like to see if you can overcome, and that is that your client testified at his deposition that the termination was by mutual consent. Thank you, Your Honor. Yes, so if I could, that's exactly the point I wanted to address in my last two minutes. It goes back to Judge Loken's question. Why do we need to go outside of this? Because the documents say what it is. He did sign off on a separation agreement that was presented to him by Kedelsky, and what our point is, and you'll see it in his deposition transcript, is this was the negotiating the terms of surrender. So they were coming to him and saying, we don't need you except for this one purpose. Will you stick around to help us get this contract? Sign on for a consulting agreement. Here's a separation agreement that we're asking you to sign off on. He agrees to that. That still meets the definition of termination without cause by Kedelsky, because they're the ones that drafted this document and presented it to him. How does it do that if it's by mutual consent? Termination by Kedelsky implies that it is against my will, against my consent. It seems to me those two things are not compatible. I think they are compatible because this happens all the time for an employee is being let go. The terms of surrender are, do you want the severance agreement or you're just gonna walk away from it? You're still terminated. You're still done. And in this circumstance, everybody's helped. It worked out well for everybody, even Mr. Kohler. So when Mr. Kohler was looking for his escrow payments to be met, they were still met here. He got everything he had coming to him. This is just a total windfall for him. He didn't lose out on anything. Kedelsky was happy. They didn't lose out on anything. They still had their customer contract renewed. Hampton was let go and not replaced. That's what Kedelsky testified to. Once they let him go, they didn't replace him. All of his job responsibilities went to other people. No replacement. No new chief technology officer. Gave it all to somebody else. He still did his part. So I understand if Judge Loken's question was, by signing that agreement, is that neutral consent? Isn't that enough? Well, first of all, you know, we're not conceding that 16B is the only way to be terminated. 16A still applies too. And how do I know that's because the contract doesn't specifically reference 16B in the post-quota PCA. It references the employment agreement broadly. It doesn't necessarily mean it has to be. That's the only way to be terminated. That's it. Thank you. Thank you, Mr. McNeil. Thank you, Your Honor. Court wishes to thank both counsel for your presence in our virtual forum this morning to hear this case. We thank you for the argument you've provided to the court, the briefing that's been submitted, and we'll take the case under advisement, render decision in due course. Thank you both.